# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|   |   |   |
|---|---|---|
| SANDRA CHACON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | 14-13235-FDS |
| | ) | |
| BRIGHAM AND WOMEN'S HOSPITAL and ROSE JOHNSON, | ) ) | |
| | ) | |
| Defendants. | ) ) | |

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS

**SAYLOR, J.**

This is an employment dispute arising out of an allegedly wrongful termination. Plaintiff Sandra Chacon alleges that defendants violated both the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2611 *et. seq.*, and Massachusetts employment-discrimination law by terminating her from her position as a patient account representative at Brigham and Women's Hospital ("BWH"). Specifically, Chacon alleges that defendants both interfered with her FMLA rights and terminated her in retaliation for exercising those rights. In addition, she alleges wrongful termination in violation of public policy on the part of defendant BWH and intentional interference with advantageous business relations on the part of defendant Rose Johnson.

Defendants have moved to dismiss the complaint for failure to state a claim. For the following reasons, the motion will be granted in part and denied in part.

I.  **Background**

   A.  **Factual Background**

The following facts are taken from the complaint unless otherwise stated.

Sandra Chacon was hired by BWH on May 2, 2011, as a patient account representative in the medicine/patient services department. (Compl. at ¶ 8). The position involved extensive telephone interaction with patients. (*Id.*).

Defendant Rose Johnson was Chacon's immediate supervisor. (*Id.* at ¶ 9). Johnson is responsible for "ensuring employee performance" in the department. (*Id.* at ¶ 14). Chacon also reported to Karl Scottron, the department head. (*Id.* at ¶ 9).

In February 2012, Chacon started to receive e-mails from Johnson criticizing her for not meeting her quota of answered telephone calls. (*Id.*). She apparently received a verbal warning. (*Id.* ¶ 19). Chacon requested and was granted a meeting with Johnson and Scottron to discuss the criticisms. (*Id.* at ¶ 10). According to the complaint, at the meeting Scottron acknowledged that there was an ongoing problem with the computer system that tracked employee telephone activity and suggested that Ms. Johnson contact the information technology department within the hospital. (*Id.*). Again according to the complaint, the IT department confirmed the problem and Ms. Johnson acknowledged it. (*Id.*).

At Chacon's request, she again met with Johnson and Scottron in the spring of 2012. (*Id.* at ¶ 11). Chacon requested the meeting to address Johnson's continued criticisms of her performance. (*Id.*). During the meeting, Johnson allegedly accused plaintiff of using her cell phone during work hours. Scottron allegedly asked Johnson if she had witnessed Chacon using her cell phone, and Johnson responded that she had not. (*Id.*).

2

According to the complaint, at that same meeting, Chacon told Johnson that several employees regularly spent time at work socializing, using the Internet, and making personal telephone calls while patients waited on hold. (*Id.* at ¶ 12). She further informed her that patients frequently called back upset that they had been placed on hold without receiving assistance. (*Id.*). She also allegedly reported that Johnson knowingly allowed certain employees to misrepresent their arrival time on the daily sign-in sheet and that she knowingly allowed several employees to "steal time" by leaving the office through the back door during work hours. (*Id.* at ¶ 13). According to the complaint, in response to those allegations, Johnson became "visibly angry" and stated, "You don't know whether I gave them permission to leave. You don't need to know. They ask permission of me, not you." (*Id.* at ¶ 14).

According to the complaint, in April 2012, Johnson "accused plaintiff of not calling in and not showing up for work," even though Chacon had sent an e-mail stating that she would be absent for medical reasons. (*Id.* at ¶ 16). Johnson apparently gave Chacon a warning for missing work without having provided an excuse. (*Id.*).[1] Chacon's doctor then sent Johnson a faxed verification that Chacon had been under her care at the time in question, and Johnson retracted the warning. (*Id.*).

On June 8, 2012, Johnson issued Chacon a written warning for "failure to meet standard performance requirements such as answering patient telephone calls on the schedule days as assigned." (*Id.* at ¶ 17). The written warning included an indication that Chacon had been

---

[1] The complaint states that Johnson was forced to "retract the warning," but does not actually state that one was issued. (*Id.* at 16).

3

verbally warned in June 2011. (*Id.* at ¶ 18).[2] It also referred to the verbal warning plaintiff received in February 2012 for failing to answer a sufficient number of patient calls, but it did not state that (according to the complaint) the telephone system had not been functioning properly. (*Id.* at ¶ 19).

On August 23, 2012, Chacon received a performance appraisal that rated her as "minimally effective in all areas." (*Id.* at ¶ 20).

In September 2012, Chacon received a written warning (apparently from Johnson) for allegedly not working on certain accounts. (*Id.* at ¶ 21). According to the complaint, Scottron asked Johnson if she could prove that allegation, and Johnson responded that she could not. After Chacon showed Johnson that the accounts listed in the written warning did not appear on her computer, the warning was removed from her personnel file at Scottron's direction. (*Id.*). Johnson then allegedly cited Chacon for having demonstrated a deficiency in "different areas." (*Id.* at ¶ 22). Chacon requested a copy of the September 2012 warning, but Johnson allegedly told her that it had been destroyed. (*Id.*).

At an unspecified time, Chacon reported her issues to Michelle Boucher, the human resources manager. (*Id.* at ¶ 23). According to the complaint, Chacon provided Boucher with a doctor's note stating that she suffered from a medical condition that had been exacerbated by the work environment and requesting a transfer as a result. (*Id.*). Boucher refused the request for a transfer, telling Chacon that she could not be transferred within six months of receiving a warning. (*Id.* at ¶ 24). She also told Chacon that she could not be transferred simply because she did not get along with her supervisor. (*Id.*).

---

[2] The complaint appears to dispute that such a verbal warning ever occurred, noting that Chacon had received a rating of "effective" in all areas in July 2011. (*Id.* at 18).

In September 2012, the hospital implemented a new system under which employees were required to sign in and out of their computers. (*Id.* at ¶ 25). According to the complaint, at some point thereafter, Johnson accused Chacon of failing to sign in or out as required. (*Id.*). Chacon produced a computer printout showing that she was indeed signing in and out, but Johnson allegedly forced her to sign a form stating that she was not. (*Id.*). Chacon attached the computer printout to the form. (*Id.*). She also asked Johnson to check with the IT department to see if there was a problem with the system of signing in and out. (*Id.* at ¶ 26). The department allegedly sent out an e-mail two days later confirming that there was a problem with the system, but Johnson never retracted her warning. (*Id.*).[3]

According to the complaint, Chacon was "denied time off during working hours to see her therapist," and "[t]his continued for several months." (*Id.* at ¶ 27). During the same period, Johnson once approached Chacon's desk at a time when she was on the telephone with a patient. (*Id.* at ¶ 28). According to the complaint, after Chacon motioned to Johnson to wait a moment, Johnson replied (in front of witnesses), "I'm tired of your f---ing shit." (*Id.*). Chacon's co-workers later asked her why Johnson hated her so much. (*Id.*).

The day after that incident, Johnson and Scottron asked Chacon to meet with them in a private office. (*Id.* at ¶ 29). They allegedly directed her to move her belongings to a cubicle used for storage across from the bathroom and the janitor's closet. (*Id.*). When Chacon inquired as to why she was being moved, Johnson allegedly responded, "just move." (*Id.*).

According to the complaint, in late March 2013, shortly before Chacon was scheduled to leave for the day, Johnson assigned her approximately 100 accounts and told her that she should

---

[3] Again, the complaint never directly states that Johnson issued a warning with respect to that issue; it simply states that the warning was not retracted.

be working on them. (*Id.* at ¶ 30). Chacon told Johnson by e-mail that she did not possess the "security clearance" required to work on those accounts. (*Id.* at ¶ 31). Johnson allegedly replied that Chacon was still required to work on the accounts and then sent an e-mail to all managers stating that Chacon had failed to handle the accounts as she was supposed to prior to closing at the end of the month. (*Id.*). According to the complaint, another manager confirmed that Chacon did not have the "codes" to work on the accounts in question. (*Id.*).

Also in late March 2013, Johnson allegedly accused Chacon of mistreating a patient. (*Id.* at ¶ 32). According to the complaint, this accusation caused Chacon to suffer an anxiety attack and subsequently to seek medical treatment. (*Id.*).

On March 29, 2013, Chacon e-mailed Johnson to request leave under the Family Medical Leave Act due to stress and anxiety. (*Id.* at ¶ 33). She also sent a form to the medical leave department. (*Id.*). On April 1, 2013, Chacon sent a medical certification for FMLA leave to the benefits department. (*Id.* at ¶ 34).

On April 5, 2013, Chacon was terminated. (*Id.* at ¶ 35).

### B. Procedural History

Plaintiff filed this action on August 5, 2014. The complaint contends that defendants (1) interfered with the exercise of her FMLA rights (Count 1) and (2) retaliated against her for exercising those rights (Count 2). It further contends that defendant BWH is liable under Massachusetts law for wrongfully terminating her in violation of public policy (Count 3) and that defendant Johnson is liable under Massachusetts law for intentionally interfering with her

advantageous business relations (Count 4).[4]  Defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted.

## II. Legal Standard

On a motion to dismiss, the Court "must assume the truth of all well-plead[ed] facts and give plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir.1999)).  To survive a motion to dismiss, the complaint must state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  Dismissal is appropriate if the facts as alleged do not "possess enough heft to show that plaintiff is entitled to relief." *Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d 76, 84 (1st Cir. 2008) (alterations omitted) (internal quotation marks omitted).

## III. Analysis

### A. Family and Medical Leave Act Claims

The Family and Medical Leave Act protects employees who attempt to exercise their right to take reasonable medical leave. *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159-

---

[4] The complaint refers to this count variously as "intentional interference with advantageous relations" and "intentional interference with contractual relations."  Plaintiff clarified in her opposition papers that she intended to frame this count as intentional interference with advantageous relations.  Defendants also expressed, in their memorandum in support of their motion to dismiss, a willingness to construe the count in this manner.

7

60 (1st Cir. 1998). Plaintiff claims two separate violations of the FMLA on the part of both defendants: an "interference" claim and a "retaliation" claim. Both claims fall under 29 U.S.C. § 2615(a), which makes it unlawful for any employer to "interfere with, restrain, or deny the exercise of the attempt to exercise, any right provided under [the FMLA]." Although the language of the statute is not explicit with respect to retaliation, employers are "prohibited from discriminating against employees . . . who have used FMLA leave." *Hodgens*, 144 F.3d at 160 n.4 (quoting 29 C.F.R. § 825.220(c)).[5]

In order to make out a *prima facie* case for FMLA interference, plaintiff must show that (1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave her employer notice of her intention to take leave; and (5) her employer denied her FMLA benefits to which she was entitled. *Carrero-Ojeda v. Autoridad de Energía Eléctrica*, 755 F.3d 711, 722 n.8 (1st Cir. 2014). A *prima facie* case of FMLA retaliation requires plaintiff to show that (1) she availed herself of a protected FMLA right; (2) she was "adversely affected by an employment decision"; and (3)

---

[5] In the FMLA context, the term "employer" includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A)(ii)(I). Although the First Circuit has not directly addressed the issue of individual liability under the FMLA, "the national trend is towards permitting individual liability and 'a majority of federal courts to address the issue of private supervisor liability have concluded that such liability exists.'" *Reilly v. Cox Enters., Inc.*, No. 13-785S, 2014 WL 4473772 at *10 (D.R.I. April 16, 2014) (quoting *Crittendon v. Arai Americas, Inc.*, No. 13-567, 2014 WL 3545517, at *3 (E.D. Va. Jan. 28, 2014)). Determining whether an individual supervisor can be considered an "employer" under the FMLA requires a fact-specific analysis focusing on whether the supervisor exercised sufficient control over the employee. *See Brunelle v. Cytec Plastics, Inc.*, 225 F. Supp. 2d 67, 82 (D. Me. 2002) (adopting the five-factor test used by the First Circuit in a parallel context in FLSA cases: "whether an individual actor (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; . . . (4) maintained employment records . . . [and (5)] had personal responsibility for making decisions that contributed to the alleged violation"). At this stage, there are insufficient facts in the record for the Court to determine whether Johnson could be individually liable as plaintiff's supervisor. Because defendants do not raise the issue, and because the complaint appears to plead facts that could support an inference of sufficient control on the part of Johnson, the Court will analyze the FMLA claims with respect to both defendants.

8

"there was a causal connection between [her] protected conduct and the adverse employment action." *Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc.*, 447 F.3d 105, 113-14 (1st Cir. 2006). A key difference in required proof between the two types of claims is causation: a retaliation claim requires an allegation (and, ultimately, proof) of a retaliatory motive on the part of the employer, but motive is generally irrelevant to an interference claim. *See Hodgens*, 144 F.3d at 159-60.[6]

Here, plaintiff's two claims arise out of a single set of facts. Count 1 alleges that defendants interfered with her FMLA rights "by dismissing her from [their] employ for having exercised her rights under the statute," and Count 2 alleges that "[b]y dismissing the plaintiff from their employ the defendants retaliated against her for exercising her rights under the FMLA." (Compl. at 41, 54). In other words, her termination is the adverse action that plaintiff contends constituted both interference with and retaliation against the exercise of her FMLA rights.

For that reason, defendants contend that plaintiff's interference claim is "simply a repackaging" of her retaliation claim and that the two claims should be analyzed as one. More specifically, defendants contend that plaintiff should not be allowed to circumvent the "retaliatory motive" requirement for retaliation claims by alleging that her termination constituted interference as well as retaliation. They conclude that arguing that an "adverse employment action was imposed on [an employee] because [she] was taking leave . . . is, inherently, a retaliation argument." *See Dressler v. Cmty. Serv. Commc'ns, Inc.*, 275 F. Supp. 2d

---

[6] Although the *prima facie* standard is an evidentiary standard, not a pleading standard, the elements of a *prima facie* case "are part of the background against which a plausibility determination should be made." *Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 54 (1st Cir. 2013).

17, 24 (D. Me. 2003).

Defendants are correct. Plaintiff's claim could be labeled "interference," but only because interference is a broad term that is sometimes loosely used to encompass retaliation claims. *See Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 331 (1st Cir. 2005) ("The term 'interference' may, depending on the facts, cover both retaliation claims and non-retaliation claims.") "Whether a claim is characterized as interference or not, its elements actually differ depending on whether the plaintiff is, at bottom, claiming that the employer denied his or her substantive rights under the FMLA or that the employer retaliated against him or her for having exercised or attempted to exercise those rights." *Id.* at 331-32.

In other words, an employer who simply blocks an employee from taking leave to which she is entitled has committed non-retaliatory interference with the substantive rights afforded by the FMLA. But an employer who terminates an employee for exercising or attempting to exercise her FMLA rights has committed a retaliatory act of interference that must be evaluated under the retaliation framework.[7] Counts 1 and 2 are therefore redundant at best, because Count 1 (the "interference" claim) must be analyzed as a retaliation claim. Count 1 accordingly will be dismissed.

Under the framework for analyzing retaliation claims, the question is whether plaintiff

---

[7] This is logical, because "the FMLA does not protect an employee from discharge for any reason while she is on leave—rather, . . . it protects her only from discharge because she requests or takes FMLA leave." *Carrero-Ojeda*, 755 F.3d at 722 (citing 29 C.F.R. § 825.220(c)). Analyzing termination claims under the framework used for "non-retaliatory interference" could as a practical matter insulate all employees who are on leave from ever being terminated, regardless of the reason behind the termination—a result contrary to common sense and established case law. *See, e.g.*, *id.* at 719 ("[W]hile an employee may not be penalized for exercising her rights under the statute, an employee may nevertheless be discharged . . . for independent reasons during or after her taking of FMLA leave."); *Henry v. United Bank*, 686 F.3d 50, 55 (1st Cir. 2012); *Bones v. Honeywell Intern., Inc.*, 366 F.3d 869, 877 (10th Cir. 2004) ("[A]n employee may be dismissed even if dismissal prevents her exercise of her right to an FMLA leave.").

has plausibly alleged a causal connection between her protected conduct and her termination. That is, in order to survive dismissal, the complaint must have plausibly alleged that defendants used plaintiff's request for FMLA leave "as a negative factor in deciding to . . . fire" her. *Carrero-Ojeda*, 755 F.3d at 719.

The strongest fact in plaintiff's favor is timing: taking her version of events to be true, as is required in analyzing a motion to dismiss, she was terminated just one week after requesting FMLA leave.[8] "But while temporal proximity is one factor from which an employer's bad motive can be inferred, by itself, it is not enough." *Id.* at 720. Moreover, plaintiff has alleged no facts directly connecting her FMLA leave status and her termination—no "negative comments, complaints, or expressions of reluctance by her superiors or co-workers about her FMLA leave-taking, no discussion of her FMLA leave status in performance reviews, etc." *Id.*

Therefore, on the allegations presented in the complaint, any inference of causation must be drawn from indirect evidence. *See Colburn*, 429 F.3d at 335-36. On that score, the complaint offers: (1) the allegation that defendant Johnson "falsely accused plaintiff of not calling in and not showing up for work" in April 2012, even though plaintiff had allegedly sent her an e-mail explaining that she would be absent for medical reasons (an accusation Johnson apparently retracted after receiving verification from plaintiff's doctor); (2) the allegation that Boucher refused to grant plaintiff's transfer request after plaintiff provided her with a doctor's note stating that she suffered from a medical condition that had been "exacerbated by the work environment"; and (3) the allegation that plaintiff was "denied time off during working hours to

---

[8] The complaint directly states that the termination took place on "April 5, 2013, one week after requesting leave." In her opposition to the motion to dismiss, plaintiff states that she was terminated on April 10, 2013, "effective April 5, 2014 [sic], just four days after requesting FMLA leave." The difference in dates is immaterial in this context.

11

see her therapist." (Compl. at ¶¶ 16, 23-24, 27).

Each of those allegations, standing alone, does little to establish that defendants bore animus toward employees who exercised their rights under the FMLA. First, Johnson apparently retracted her warning upon receiving verification that plaintiff actually had a medical appointment. That would seem to vitiate any inference that she intended to punish plaintiff for seeking medical attention, and instead would seem to support the alternative inference that she simply doubted plaintiff's self-report of a medical absence.

Second, Boucher's refusal to grant plaintiff's transfer could have been based on any number of factors, and was, in any event, apparently mandated by an internal policy. (*See* Compl. ¶ 24 ("Ms. Boucher refused plaintiff's request for a transfer. She stated plaintiff could not be transferred within six months of receiving a warning.")). More importantly, plaintiff's request to Boucher was for a transfer, not for paid medical leave. Any inference of animus toward leave requests that could be drawn from the refusal would thus be somewhat attenuated.

That leaves the alleged denial of plaintiff's requests for time off to see a therapist. An employee might be entitled to count a trip to the therapist as FMLA leave, or might not be; the result depends on a number of factors, including whether the employee provided sufficient notice. It is unclear from the complaint whether that alleged denial bore any relationship to plaintiff's rights under the FMLA.

In short, the complaint alleges a relatively weak case for FMLA retaliation.[9] However,

---

[9] Among other things, the thrust of the complaint itself supports an alternative explanation as to why plaintiff was terminated: the fact that her supervisor "hated her." (Compl. at ¶ 28). The complaint details more than a year's worth of conflict between plaintiff and defendant Johnson, including incidents in at least February, April, June, and September 2012 and March 2013. The April 2012 incident involved an unexcused absence for medical reasons, but it was quickly resolved once Johnson received a written verification from the physician. The remainder of the conflicts did not relate in any way to medical leave. In addition, plaintiff received a performance appraisal in

12

taken as a whole, the complaint could be read to allege some history of employer hostility to medical leave—on the part of both defendant Johnson and BWH—followed by an abrupt termination after a formal FMLA request.[10] Thus, considering the allegations in the aggregate, and "giv[ing] plaintiff the benefit of all reasonable inferences therefrom," *see Ruiz*, 496 F.3d at 5, the Court cannot say the complaint clearly fails to state a claim to relief that is "plausible on its face." *Twombley*, 550 U.S. at 570. Put another way, even if the complaint could support other inferences as to the reason for her termination, it also could support an inference that the leave request played at least some role in the termination decision. *See* 29 C.F.R. § 825.220(c) (stating that "employers cannot use the taking of FMLA leave *as a negative factor* in employment actions" (emphasis added)). Therefore, the retaliation claim will not be dismissed for failure to state a claim. Whether the evidence proves to be sufficient is a question for another day.[11]

Accordingly, Count 2 will not be dismissed.

---

August 2012 that rated her as "minimally effective" in all areas. (Compl. at ¶ 20). Read as a whole, the complaint suggests that defendant Johnson (plaintiff's direct supervisor) held her job performance in very low regard (whether rightly or wrongly). Considering the "cumulative effect of the complaint's factual allegations and the larger picture surrounding her discharge," as is appropriate at this stage, *see Carrero-Ojeda*, 755 F.3d at 721, plaintiff's termination appears to be consistent with her reputation within her department as it existed before she ever requested medical leave.

[10] Although not all of plaintiff's relevant allegations apply to Johnson directly, those that do appear to be minimally sufficient to state a claim upon which relief can be granted.

[11] Defendants further contend that the complaint does not allege facts sufficient to put defendants on notice that she intended to take leave under the FMLA due to a serious health condition. They cite to *Kobus v. Col. of St. Scholastica, Inc.*, 608 F.3d 1034, 1037 n.3 (8th Cir. 2010) for the proposition that "[c]omplaining of stress and anxiety is not enough to put an employer on notice of a serious health condition." The court in *Kobus*, however, was analyzing a situation in which an employee had never formally filed an application for FMLA leave. *Id.* at 1037. Here, however, plaintiff alleged that she "requested leave under the Family Medical Leave Act due to stress and anxiety" and that she subsequently "sent a medical certification for FMLA leave to the Benefits Department." (Compl. ¶¶ 33-34). For that reason, the allegations are sufficient to survive a motion to dismiss.

### B. Wrongful Termination in Violation of Public Policy

In Massachusetts, "[t]he general rule is that an employment-at-will contract can be terminated at any time for any reason or for no reason at all." *Folmsbee v. Tech Tool Grinding & Supply, Inc.*, 417 Mass. 388, 394 (1994). For that reason, "an at-will employee has a cause of action for wrongful termination only if the termination violates a clearly established public policy." *King v. Driscoll*, 418 Mass. 576, 582 (1994). The Massachusetts Supreme Judicial Court "consistently has interpreted the public policy exception narrowly, reasoning that to do otherwise would 'convert the general rule . . . into a rule that requires just cause to terminate an at-will employee.'" *Id.* (quoting *Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch.*, 404 Mass. 145, 150 (1989)). More specifically, the court has held that "the internal administration, policy, functioning, and other matters of an organization cannot be the basis for a public policy exception." *Id.* at 583; *see also Mello v. Stop & Shop Cos., Inc.*, 402 Mass. 555, 560-61 (1988) (holding that "[n]o well defined public policy principle would have been violated" had plaintiff been discharged for complaining about "alleged wrongs" committed by the defendant employer so long as they "concern[ed] internal matters").

Here, plaintiff alleges that she was "terminated in violation of a clearly established public policy; that is, for exposing that employees were stealing time from BWH with management's knowledge and consent." (Compl. ¶ 60). She appears to be referring to the allegation that she informed Scottron, in the spring of 2012, that "several employees in the department were stealing time by leaving the office through the back door during work hours and that Ms. Johnson was aware of it" and that "Johnson allowed certain employees to sign in early when they were really coming in late." (*Id.* ¶ 13).

The complaints plaintiff allegedly lodged with Scottron about Johnson's supervisory practices appear to relate to the internal functioning of the hospital. If Johnson truly was allowing employees to fabricate their hours, then she was presumably violating an internal time-keeping policy and defendant was paying wages to employees for hours they did not work. Those consequences affect defendant's internal administration and revenue; they do not (at least as alleged) implicate any broader public policy.

Plaintiff acknowledges that the public-policy exception does not generally extend to a termination induced by an employee's complaining about the employer's internal procedures, but contends that the exception may apply where the alleged wrongdoing "has a significant impact on the general public." (Pl. Opp. at 17). She contends that Johnson's alleged practice of allowing her subordinates to collect pay for unworked hours allowed employees to, in effect, "steal" hospital resources. She equates that practice to "criminal fraud" and contends that it "ultimately impacts the health insurance rates for the general public." (*Id.*).

Even accepting plaintiff's factual allegations as accurate, that is not enough. Where alleged wrongdoing has only a "remote effect on the public," and an employee objects to it "in the context of a conflict over internal policy matters," that is not sufficient to trigger the public-policy exception. *See King*, 418 Mass. at 584 (holding that an employee's termination for participating in a shareholder derivative suit was not wrongful under the public-policy exception). Although the public might benefit from an employee's raising concerns over irregular and dishonest time-keeping, the public policy exception does not extend to every situation in which an employee has performed "appropriate, socially desirable duties." *See Smith-Pfeffer*, 404 Mass. at 150 (upholding the termination of an employee who had expressed

disagreement with a superior's management of the defendant school).

Accordingly, Count 3 will be dismissed.

C. **<u>Intentional Interference with Advantageous Relations</u>**

Count 4 alleges intentional interference with advantageous relations against defendant Johnson. "In an action for intentional interference with advantageous relations, an employee must prove that (1) she had an advantageous employment relationship with her employer; (2) the defendant knowingly induced the employer to break that relationship; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the employee was harmed by the defendant's actions." *Weber v. Community Teamwork, Inc.*, 434 Mass. 761, 781 (2001). Although an employee may not sue her employer for interfering with its own business relations, *Harrison v. NetCentric Corp.*, 433 Mass. 465, 476 n.12 (2001), "a supervisor may be personally liable if [s]he tortiously interferes with a subordinate's employment relationship." *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 76 (1st Cir. 2001) (citing *Steranko v. Inforex, Inc.*, 5 Mass. App. Ct. 253, 273 (1977)). However, in bringing a claim against a supervisor, "the plaintiff is required to show, as to 'improper motive or means,' that the 'controlling factor' in the alleged interference was 'actual' malice; 'implied' malice is not sufficient." *Weber*, 434 Mass. at 781 (citing *Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659, 663-64 (1981)); *see Wright v. Shriners Hosp. for Crippled Children*, 412 Mass. 469, 476 (1992) (a supervisor will not be held liable for terminating her subordinate "unless [s]he did so 'malevolently, *i.e.*, for a spiteful, malignant purpose, unrelated to the legitimate corporate interest.").

"Proof of actual malice requires more than a showing of mere hostility." *Zimmerman*,

16

262 F.3d at 76 (citing *King v. Driscoll*, 418 Mass. at 587. If a supervisor simply dislikes an employee, or believes she was a poor employee, that is not enough. Holding a supervisor liable under those circumstances would violate the principle that a supervisor's "freedom of action directed toward corporate purposes should not be curtailed by fear of personal liability." *Gram*, 384 Mass. at 663-64.

The complaint alleges that defendant Johnson "wrongfully procured the termination of the plaintiff's employment relationship with BWH" and that she did so "because plaintiff exercised her rights under the FMLA and because she reported that Ms. Johnson allowed employees to steal time from BWH." (Compl. ¶¶ 65, 67).[12]

One of the essential elements of a FMLA retaliation claim is retaliatory motive—that is, whether defendants (including Johnson) brought about plaintiff's termination in retaliation for her exercise of her FMLA rights. A termination based on such a retaliatory motive would constitute a form of unlawful discrimination, and an act of unlawful discrimination can support an inference of actual malice. *See Weber*, 434 Mass. at 782. Accordingly, the facts supporting plaintiff's FMLA claim may likewise support the tortious interference claim as well. *See Zimmerman*, 262 F.3d at 77 ("[T]he elements underlying a claim for unlawful retaliation may be used to show malice when a tortious interference claim is brought against a supervisor in a loss-of-employment case.").

The complaint also contains other allegations, apparently unrelated to the FMLA claims, that could arguably support an inference of actual malice on the part of Johnson. As noted,

---

[12] The complaint does not elsewhere allege that Johnson herself made the decision to terminate plaintiff; the prior reference to her termination states only that "plaintiff was terminated" on April 5, with no explanation of how or by whom. (Compl. ¶ 35). However, because defendant Johnson is alleged to be plaintiff's direct supervisor, the complaint as a whole plausibly supports the inference that she was involved in the decision to terminate plaintiff.

17

plaintiff allegedly reported that Johnson had knowingly allowed other employees to commit misconduct. The complaint alleges that thereafter, on one occasion, "Johnson came to plaintiff's desk while she was on the phone with a patient. Plaintiff motioned to Ms. Johnson to wait one moment. Ms. Johnson replied, in front of witnesses, "'I'm tired of your f---ing shit,'" an incident that led plaintiff's co-workers to ask her why Johnson "hated her so much." (Compl. ¶ 28). After that incident, according to the complaint, Johnson and Scottron ordered plaintiff to move her belongings to "a cubicle used for storage in an undesirable location across from the bathroom and the janitor's closet." (*Id.* ¶ 29). Finally, the complaint alleges that, in late March 2013, Johnson chose the end of a work day to assign plaintiff 100 new accounts that she was not authorized to view; when plaintiff attempted to inform her that she did not have the required access to work on the accounts, Johnson allegedly sent an e-mail to all managers criticizing her for not completing the work. (*Id.* ¶¶ 30-31).

Again, mere hostility by a supervisor toward an employee is not enough to make out a claim of tortious interference. Here, however, the complaint appears to allege that Johnson maliciously terminated plaintiff to cover up her own misdeeds, and for no legitimate corporate interest. Whether plaintiff can adduce evidence of that alleged malice and motive remains to be seen. Under the circumstances, however, the allegations in the complaint are sufficient to survive a motion to dismiss.

Accordingly, Count 4 will not be dismissed.

**IV.** **Conclusion**

For the foregoing reasons, the motion to dismiss is GRANTED as to Counts 1 and 3 and otherwise DENIED.

18

**So Ordered.**

|  |  |
|---|---|
|  | /s/ F. Dennis Saylor |
|  | F. Dennis Saylor IV |
| Dated: April 16, 2015 | United States District Judge |